Case number 20-5163, Overdevest Nurseries, L.P., Abellant v. Eugene Scalia in his official capacity as United States Secretary of Labor et al. Mr. Lake for the Abellant, Mr. Goldsmith for the Abellese. Mr. Lake, please proceed when you're ready. Good morning, and may it please the court. My name is Monty Lake, and I appear on behalf of Overdevest Nurseries. The issue before the court this morning is the validity of the Department of Labor's 2010 corresponding employment rule under the Supreme Court's Chevron standard and the Administrative Procedures Act's arbitrary and capricious standard. In 2010, the Department of Labor changed its rule on corresponding employment to basically state that any work, any task performed by a U.S. worker that was the same as an H-2A foreign worker deserved to be paid the same adverse effect wage rate. This was a significant departure from the rule that had been in effect for 21 years, since 1987, issued contemporaneously with the Immigration Reform and Control Act of 1986 that used the statutory language occupations as a standard against which to measure whether or not there was corresponding employment between U.S. and foreign workers. This change was made in 2010 with a statement that the department was really returning to the 1987 rule, because there had been a brief interlude in 2008 when the rule was essentially the same, except for two problems that the department had a problem with, one of which was the allowance of incidental employment outside of the job description approved by the Department of Labor. It corrected that problem in the 2010 rule, eliminated it, but then went on to use the any work standard. Our view, we believe the law supports the fact that this change is not an interpretation of the statute, it is really an amendment of it, because it takes out the able, willing and qualification standard of the law. Overdivest, unlike many in agriculture, has very high- a question that's about, just to understand your argument and the claim, is it your contention that removing in the occupations or in the same occupations, removing that language, did anything different or in addition to adding the in any work language? Well, yes, the occupation is what the Department of Labor, when it looks at a job order, an application to participate in the program, it's the gatekeeper. When it looks at the occupation, it is looking at all the duties described in the job order, the skilled duties in the case of overdivest, order pullers, or it can be a farm that has pepper pickers, and that's all they do. In which case, everyone does the same thing, that is an easy judgment to make. When you have the situation with overdivest, where you have individuals who have to identify over 2000 varieties of plants and then match them with their Latin botanical names from customer orders, this is highly skilled work. And so different occupations are different. The statute talks about occupations or crops. Counsel, before you go into the policy arguments you're making, isn't it crystal clear what the actual operative language of 2010 says, 2010 regulation, put aside the preamble, the reference to job order. Isn't it crystal clear what the actual operative language of the 2010 regulation says? You may argue that it's improper for one reason or another, but it is crystal clear, is it not? Yes, the language is clear. It says any work, and we do not argue under our, that there was ambiguity as to what the... Let's put aside the preamble, which is really not relevant. Okay, so we can accept then the language is clear. You were on notice as to what the language said. Your argument is somehow it's inconsistent with the statute or somehow arbitrary and capricious, but there's no question you were under notice. Well, the rule was there. Our client was not aware that the rule had changed. And in fact, he had... That in 10 cents gets you on the trolley car. If the client didn't hire a lawyer to read it, that's his problem. Well, your honor, I agree with you that the language of the rule is clear. The question is whether, as it was applied to our client, when the first time he was aware of it, and he had basically had the same job order approved by the department for 12 or 13 years up until this point, it's his first opportunity to challenge the legality of the rule itself based on the statute. Well, I want you to eliminate any question of notice because it's irrelevant. The regulation was crystal clear. And if your client didn't hire a lawyer to read it for him, that's no excuse. So why don't you just eliminate that from the argument? Well, our argument, taking our point we go to is that the Department of Labor approved this job order from 1999 to 2012. And there was no enforcement action taken against it based on it. But again, that in 10 cents gets you on a trolley car. The question is what the regulation means. And were you on notice of it? And the answer to both questions is yes. It's perfectly clear what it means. And you were on notice. So the fact that a Department of Labor official before that regulation was unclear as to what the meaning was, is irrelevant.  is whether or not it withstands scrutiny under Chevron and the Administrative Procedure Act in terms of being a violation of the statute upon which it is based. And our argument is very simply is that if you look at the statutory language, which states basically we have two provisions here. We have the able, willing and qualified, which has been written out of the statute by this regulation. And we have the similarly employed US worker language. The common thread between both of these statutory phrases is labor or services. The labor services in the similarly employed language upon which the department relies, references that enable willing, which references the petition. And the petition is accompanied by the job order and application with the specific duties specified by over the best. And in this particular case, and it was certified and approved for 13 years up to this time by the Department of Labor before this issue was raised. And we believe very strongly that the- But counsel, I keep going back to what the situation was before the regulation was passed. And I keep telling you, and I don't understand you to say anything different. It's irrelevant. Well, the question is whether or not the statute can withstand scrutiny in terms of whether, excuse me, the rule under the provisions of the statute. And that has been our argument in this case that it's not. The language able, willing and qualified has to mean something. Yes, it's something for the first section, but not the second section. But they are interrelated. The department has made the argument accepted by the district court that the rule in this case is based upon the similarly employed language strictly. They believe that the qualification language is irrelevant, but their purpose they rely upon is protecting US workers. And they ignore the adequacy of the labor force, which was the other purpose, which in Dole stated had to be balanced. You had to look at both of them and you can't justify the effect of its rule. The effect of this rule is as discrimination. It separates those who apply and are not qualified who do not have to be hired and paid anything. And those who- I don't read it that way, counsel. I don't read the adverse effects section, the second section of the statute as tied to the first section at all. The first section asks the question, are there available workers to do this job? The second question is, second statutory section says, even if there are, there should not be an adverse effect on them. Even if there are no able, willing workers available to do this job, nevertheless, we wish to protect against adverse effect. An adverse effect to conditions as well as wages. And if the foreign workers perform work that would otherwise be performed by domestic workers, that hurts them. That takes away their job opportunities. Well, your honor, that's not the case here because you had highly skilled workers who did the substantial majority of their job doing these highly skilled tasks. Yes, and so far as they perform any other task that would otherwise be performed by domestic workers who are not able, willing to do the highly skilled work, insofar as they're doing that work, they're taking it away from the domestic employees. Well, two responses to that. Number one, they basically, the client was doing what the Department of Labor wanted them to do when it attacked the 2008 rule, which basically the department had a problem with the incidental employment. And the client put that- I do not understand counsel why you keep going back to 2008. The question is what the 2010 modified regulation means. Well, I was trying to respond to your question about whether or not the similarity in doing a few minor tasks in common was adversely affecting them. And what the overdivest was trying to do was what the department wanted them to do is have full disclosure in their job order when it was advertised for domestic workers to apply for the job. And because there would be times when there would be overlap in the duties, when they essentially are working as a team in the workplace, they wanted to protect themselves from debarment. And that is a specific provision in 2008 that the department eliminated. Our client was doing exactly what they wanted to do since they entered the program in 1999. They were doing exactly what the department wanted them to do. And the department approved the job order that had the incidental duties in addition to the highly skilled occupations along with it. So we don't feel we were adversely affected. We're doing what the department approved that we could do. I'll make sure my colleagues don't have further questions for you at this point. Mr. Lake, why don't we hear from the government? Thank you, Mr. Goldsmith. May it please the court, Aaron Goldsmith on behalf of the government. As the district court recognized, this is a classic Chevron case. In this case, Congress created the H-2A program and delegated authority to the Department of Labor to make policy choices and to design the rules implementing and governing this program. Significantly, Congress did not define the terms adversely affect or similarly employed, but rather left it to the agency to fill in those gaps and to accomplish the two goals of this program of protecting U.S. workers, but also allowing employers to bring an adequate supply of labor. And that's what happened here. In 2008, the agency made one policy decision to limit the scope of corresponding employment to newly hired workers. In 2010, the agency made a different policy decision deciding to remove that limitation and to further expand the scope of corresponding employment to include work that was performed outside of the job order. There was nothing irrational or improper in the agency making these policy decisions. And I would add- Now, counsel, would you say that the scope of the 2010 rule is broader than the scope of the 1987 rule? In one respect, in one substantive respect, and that is with respect to work performed outside the job order. With respect to this idea that the 1987 rule was limited to only qualified workers, that's simply not the case. And as the preamble to both the 2008 and the 2010 rule set forth, they're carrying forward the old requirement that the adverse effect wage rate be paid to any domestic worker performing any of the same task, any of the same work. And I think the agency went a little bit beyond that in the preamble to the 2010 rule in explaining exactly that this is not a new requirement and tracing with citations to the federal register this requirement in previous rules and previous programs going all the way back to 1967. Now, that's not directly applicable here, but the point is, this is not a new requirement. We set forth the agency handbook, the Hyatt Farms- But didn't the agency in 2010 imply that it was essentially the same rule as 1987 when that's not really the case? Well, it did expressly state in the preamble that it was making this change for expanding it in terms of any work performed by the H-2A worker in the agricultural capacity. That is, even if the work was outside of the job order and it explained the reason for doing so and the district court recognized that and set that forth in the district court opinion. Now, so there was a change. It was not identical to the 1987 rule, but it explained that change. And moreover, I think agencies sometimes use different terminology, different words, and the fact that the two rules don't have the identical words is not dispositive. And the agency has sort of set this forward has explained it moving backwards. And I would also add, we're not writing on a blank slate. This court addressed a similar issue in the Dole decision where it said, look, Congress has not defined what adverse effect means. That case dealt with the methodology for the adverse effect wage rate. It was a policy decision. It was within the bounds of a rather broad congressional delegation. And this involves a similar issue, although not an identical issue of to whom that adverse effect wage rate must be paid. To whom is it owed? And the reasoning applies here. There was a change, but that change was explained. There's nothing improper about an agency changing its mind or determining, look, we need to take additional steps, additional measures that protect you. Thank you. I mean, one of the other things though that was changed in 2010 was the language about occupations was removed, same occupation. But I don't recall seeing any reference to that change in the rule. And that was raised in the opening brief, pages 43 and 44, I believe of the opening brief. And I didn't see any response to that in your brief. Did I miss that in either the rule or in your brief as far as any explanation for why the occupations language was taken out? So your honor is correct that the occupations language was taken out, but the agency never defined in that regulation what occupations means. Its position and its understanding that was set out in the preamble to the 2010 rule is that if it was any work, you had to pay the adverse effect wage rate to those US workers. So that, it is true that it used the word occupations and that word does not appear in the 2010 rule. We can see that point, but the agency didn't, this isn't something where there was no explanation. It traced that requirement back through different rules, even though the program has changed considerably over the years and there've been all kinds of changes. The terminologies has not been the same. This requirement has remained the same with the exception, with limited exception for the period of time from 2008 to 2010, when there was this additional limitation to newly hired workers. That was, if you look at the 2008 preamble, that's what they're saying were changing. And then in 2010, they're explaining why they're removing that limitation that it proved to be unworkable, that they look at it and there were these anomalies produced by that rule. So that was kind of the reasoning and that was what was set forward. And I think the judge kind of, the district court judge hit the nail on the head and this is on page 412 of the joint appendix in terms of looking at the different rules,  none of them restricted it in the manner in which the plaintiff suggests. And that under any of those, it's not limited to workers having the same qualification, rather it's any work with the exception of that one limited exception that I just discussed for the period of time from 2008 to 2010. And I understand something, I guess, just kind of factually in how this program works. Are the H-2A workers paid the adverse effect rate for everything that they do, whether it's the kind of what's specifically in their qualifications or in this case, when they are doing the other agriculture or other any work, they're paid the same wage rate for all of it. Is that correct? I believe that's correct with one caveat, the H-2A program creates a wage floor and there are some circumstances where that floor is above the rate of the adverse effect wage rate. But for the purposes of this case, the wage floor is the adverse effect wage rate. Wait a minute, wait a minute, counsel, I misunderstood that. I thought from reading the briefs, I thought the domestic workers would be paid at a higher rate, the adverse rate for work it performed that was identical to the work performed by the skilled workers, the skilled workers in the non-skilled task. In other words, I didn't understand, maybe I have it wrong. I didn't understand that if the skilled workers performed, say 20%, spent 20% of their time on unskilled work, that the unskilled workers would get all of their pay at adverse levels. I thought they would only get pay for the kind of work that was unskilled that the foreign workers did. I see my time has expired. May I just address that question? Yeah, yeah, of course. So they're to be paid the same wages for the same work as the shorthand. That's what I thought, for the same work, not for all their work. For the same work, not all their work. For the same work. And that's why the district court's ruling was correct and should be affirmed. But I thought, aren't we talking about two different things? Maybe I'm misunderstanding, but I thought what Judge Silverman is asking about is the wages for the similarly employed. And for them, they get the adverse effect wage for work that's the same as that performed by the H-2A workers. But I thought, and they don't get the adverse effect wage for other work. They only get it for the work that's the same as the work that's performed by the H-2A workers. But I thought Judge Wilkins' question was about the wages paid to the H-2A workers. Maybe I misunderstood. I think, Your Honor, I apologize. I think I misunderstood Judge Wilkins' question. So I apologize to you, Your Honor, for misinterpreting what you were saying. But be it as it may, that's how the program is structured as it's set forward. And I think the district court judge hit the nail on the head. Yeah, so Judge Srinivasan is correct. I was trying to get at the issue of, let's suppose the skilled H-2A worker does 80% of the kind of work in the specific qualifications, but 20% of their work is unskilled. Work that domestic workers also do. My question is just simply, they get paid that adverse effect wage for the 20% the same as the 80%, right? Well, the answer is whatever was in the job order, whatever the employer certified that they were going to pay. But it would be the adverse effect wage rate in this particular case. So one of the things I'm trying to understand and help me if I'm a little thick here is why it would be in the employer's interest to have them at least economic interest to have them do work kind of outside of the skilled work for lack of a better way of putting it. If they're got to pay these foreign workers a higher wage than domestic workers to do the same work, why is that kind of ever in their economic interest to do that? Well, employers have to make different decisions, business decisions based on kind of the realities that they're faced with. And there are situations where, and I think this is something that just report was alluding to, you might have a situation where you might, well, I'm not sure how else to put it, that you might have situations where they make decisions based on the work that's available, what needs to be done, and they make those decisions. And that's simply- Let me put it this way. I think there's discussion in your brief of a hypothetical situation where really there's only enough skilled work for eight employees. But instead of only hiring eight of the foreign H-2A employees, the company might hire 10 and basically kind of use that extra capacity to have those H-2A workers doing work that U.S. workers could be doing. And we don't want that to happen. We want to protect jobs of U.S. workers. That makes sense if they would be paying the foreign workers less than what they would have to pay U.S. workers. But I don't really understand how that makes sense if they got to pay the foreign workers more than what they have to pay U.S. workers. May I try and answer that as a former labor official? Well, I guess so. I was wanting to see counsel's answer, but- All right, go ahead. I was hoping that you were going to throw me a line there. So let me just say the concern is that there are these two provisions, subsection A and B. And A concerns this idea that you don't want to have a situation where someone has to certify that there is no qualified domestic worker for a position. And then the fact that an employer might say, well, I would prefer to hire a foreign worker for whatever reason is not acceptable under subsection A. And then as to why they might do this, I don't really want to speculate more than what we had said and what the district court identified, that you might have the situation where businesses for whatever reason make the decisions that they make. Let me ask the question this way to follow up on Judge Wilkins. Here's what I understand would be the economic incentive on the part of the employer to get around the regulation. He wants to hire skilled workers, but he knows that say 10 or 20% of the time, they won't be occupied on skilled work and they would like to be able to take incidental unskilled work. Otherwise they would just be sitting around doing nothing. And that's not very economical. Now, when they do that non-skilled work, of course, they're paid even under the old system, higher wages, but it's still worth it to have them not sitting around because that's a dead loss. But when they do perform the unskilled work, they're taking it away from the unskilled workers. So they're adversely affecting their labor conditions. So that's what I understand the regulation has meaning. Am I not correct? No, that is one scenario. So for example, under the facts of this case, there were 55 foreign workers. Perhaps you could have had a situation where they had only brought over 52 foreign workers and there would have been additional work for US workers. So that's what we're getting at. Yes, of course. So Judge Wilkins asked a very good question. What is the economic incentive for the employer to have the skilled workers doing unskilled work? And the answer is it's incidental and the employer doesn't want them sitting around. So he would like them doing that work. Now he will pay a high rate for that, but it's better than those sitting around. And when they do do that work, they adversely affect the domestic workers because they take away some of their job, some of their work. And it's not just wages, it's conditions. Am I not correct? No, that's correct, Your Honor. Thank you. That helps me understand better. Unless my colleagues have further questions for you, Mr. Goldsmith, we'll give Mr. Lake his rebuttal time. Thank you. Mr. Lake, we'll give you two minutes for your rebuttal. Thank you. To answer several of the questions just posed, the H-2A workers are paid the premium wage rate for all the work that they do. There is no incentive for an employer to bring in H-2A workers as a cost-cutting measure. They pay for free housing, they pay their inbound and outbound transportation costs in addition to the elevated wage. The back wages sought in this case are for the entire period that the non-H-2A production workers who did not have the skills coincided employment with the H-2As. It is an absolute practical impossibility to go around the workforce and look at what every person is doing at one time and measure in minutes exactly when there is an overlap in duty. The reason the incidental duty language was put into the occupation of Order Puller was to avoid the problem, as I mentioned, the department was so concerned about and eliminated in 2008. That was the reason it was done. The client wanted to have full disclosure. There are times in a dynamic agricultural workforce where people are working together as teams to do things, whether it's pulling plants, putting them on trucks, filling out the orders, comparing them to what the customer wants. It would be an absolute impracticality as suggested in the brief before this court by the department to go around and having teams with stopwatches measuring activities that each is doing. The preamble to the 2010 rule says the intent by going to any task in common, as opposed to an occupation, the statutory language was not to bring the entire workforce into the adverse effect wage, but that is exactly what has happened here. They have basically created an impractical situation, which is impossible to comply with in the nature of a workforce. And the department in the preamble to this rule acknowledged that when they looked at qualifications for jobs, their intent was not to micromanage and tell business operations how to run their businesses. And that's exactly what has happened here. And the department, as we stated in our brief, and as their expert in countrywide, Jim Mooney on this program, who did the audit conceded, it's pretty much impossible for in an ag workforce to basically not have people doing the same thing at the same time on some occasions. And he talked about it. He was characterized as a catch 22. Okay. Thank you, counsel. Thank you to both counsel for your arguments. We'll take this case under submission.
judges: Srinivasan, Wilkins, Silberman